IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**United States of America**
*ex rel.* **Rayme M. Edler, M.D.**

**Plaintiffs,**
**v.**

CASE NO. _3:20cv5503- RV/ HTC_

**Escambia County**

**FILED UNDER SEAL**
**31 USC §3730(B)(2) AND**
**LOCAL RULE 5.5 (B)**

**Defendant.**
_____/

## COMPLAINT

1.      Qui tam Plaintiff-Relator Rayme Edler, MD, through her attorneys, brings this Complaint on behalf of the United States, and on her own behalf, pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3730 *et seq.*

2.      Medicare and other government programs pay for certain necessary and reasonable medical services, but services are not reasonable when they are performed by unlicensed and unqualified personnel. Escambia County knowingly filed claims for medical services performed by unlicensed and unqualified personnel.

## I.    Jurisdiction, Venue, and Parties

3.    This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a)

and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The Court has

personal jurisdiction over the Defendant because Defendant transacts business and

can be found in this district and committed acts within this district that violate 31

U.S.C. § 3729.

4.    To the extent that there has been a public disclosure of "allegations or

transactions" in this Complaint, the Relator is the original source under 31 U.S.C.

§3730(e)(4). Relator has direct, independent, and material knowledge of the

information that forms the basis of this Complaint and voluntarily disclosed that

information to the Government before filing.

5.    Venue is proper in this district under 31 U.S.C. § 3732(a) because at all times

relevant to this Complaint, Defendant regularly conducted substantial business

within this district.

6.    Defendant's conduct had a material effect on government-funded health

plans' decisions to pay for services performed by Defendant. Had the United States

known that Defendant misrepresented the schemes described herein, government-

funded health plans would not have paid or made reimbursements.

7.   **Qui Tam Plaintiff/Relator Rayme Edler, MD, MSPH,** Florida license

ME109913, is employed as the Escambia County Medical Director and Director of

Emergency Medical Services from May 2018 until the present.

8.   Dr. Edler's responsibilities include providing medical direction and oversight

for Escambia County's Public Safety and Correctional Center. This includes

- Escambia County Emergency Medical Services,
- Escambia County Fire Rescue,
- Escambia County Dispatch,
- Pensacola City Fire,
- Pensacola Beach Lifeguards,
- Medical staff at the Escambia County Correctional Center and Road Prison,
- National Park Rangers who are EMTs and Paramedics in Fort Pickens, Fort McRee, Johnson Beach, and Opal Beach (medical oversight only).[1]

9.   Dr. Edler's experience made her exceptionally well-suited for this position.

After she completed college in 2000, she worked as a New Orleans-based

EMT/Paramedic, including work as a paramedic supervisor on for Lifeguard

Ambulance Service. Then, while studying for her Masters in Public Health, she

worked at Charity Hospital, New Orleans. After earning her M.D. in 2007, she

served emergency department patients.

10.   In addition, from July 2011 until the present, Dr. Edler works as an

emergency medicine board-certified physician for ApolloMD at Baptist Hospital,

Pensacola, FL and Gulf Breeze Hospital, Gulf Breeze, FL.

---

[1]      Defendant has a service agreement with the National Park Services.

11.    Relator's licenses and certifications, and expiration dates include:

- ·   Florida Medical License, ME109913. Active: 01/31/2021.
- ·   Advanced Trauma Life Support. Expiration: 09/2020.
- ·   Advanced Cardiac Life Support. Expiration: 08/2020.
- ·   Pediatric Advanced Life Support. Expiration: 07/2020.
- ·   Basic Life Support. Expiration: 08/2020.
- ·   American Board of Emergency Medicine. Expiration: 12/2021.
- ·   Tactical Combat Casualty Care. Expiration: 09/2022.
- ·   Basic SWAT Medic Course Completion.
- ·   ACLS Instructor: 08/2021.
- ·   BLS Instructor: 08/2021.

12.    With respect to allegations made upon information and belief, Relator has,

based upon Relator's knowledge, data, and prior experience, a reasoned factual

basis to make the allegations herein but lacks complete details of them. While

Relator has significant evidence of the fraud alleged herein (the details of which

follow), much of the documentary evidence necessary to prove these allegations is

in the possession of Defendant and the United States.

13.    **Defendant Escambia County,** NPI 1518960426, provides healthcare

services, including emergency medical services and transportation.

14.    The state of Florida Dept. of Health license verification shows the Escambia

County Public Safety Department EMS is an EMS service provider with an

advanced life support license ALS 1703, issued in 1992.

15.    Escambia County has a population of approximately 300,000, and 2019 total

revenue of $415,683,067.

4

## II.   The Law

### A. Medicare and government programs.

16.    The false claims complained of herein arise from services provided under the

United States governments' Medicare, Medicaid, ChampVA (f/k/a Champus),

Tricare, and other federal employee and veteran healthcare programs.

17.    In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §

1395 *et seq*., known as the Medicare program. The Center for Medicare and

Medicaid Services ("CMS"), which is part of the Department of Health and Human

Services, administers Medicare.

18.    To participate in the Medicare program, healthcare providers enter into

contracts with HHS-CMS in which the provider agrees to conform to all applicable

statutory and regulatory requirements for reimbursement from Medicare, including

the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of

Federal Regulations.

19.    Among the most crucial legal obligations of participating providers is the

requirement not to make false statements or misrepresentations of material facts

concerning payment requests. 42 U.S.C. §§ 1320a-7b(a)(1)-(2); 42 C.F.R.

413.24(f)(4)(iv).

20.    Each of the federally funded health-care programs requires every provider

who seeks payment from the program to "enroll" and sign Provider Agreements in

5

order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs. 42 C.F.R. § 424.500 *et seq*. As part of these agreements, without which the provider may not seek reimbursement from federal health-care programs, the provider certifies compliance with Medicare laws, regulations, and program instructions.

21.     TRICARE/CHAMPVA is a federally-funded program that provides civilian health benefits, including hospital services, to U.S Armed Forces military personnel, military retirees, and their dependents, including some reservists. Reimbursement from TRICARE/CHAMPUS also requires certifications similar to those required for Medicare reimbursement. Consequently, whenever a Medicare submission contains false data or information, the corresponding reimbursement requests submitted to TRICARE/CHAMPUS are also false.

**B. The False Claims Act.**

22.     With the enactment of the federal False Claims Act, Congress recognized the benefits of incentivizing integrity and repeatedly amended the Act to further enhance the ability of the U.S. Government to recover losses to the federal treasury sustained as a result of fraud.

23.     Congress intended that the False Claims Act amendments enhance incentives for individuals with knowledge of fraud against the federal government and

6

encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

24.     Congress has found that fraud in federal programs is pervasive and has recognized the False Claims Act as the government's primary tool for combating government fraud.

25.     The False Claims Act prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money. 31 U.S.C. §§ 3729-3733.

26.     The Act allows any person having knowledge about a false or fraudulent claim against the government to bring an action, to share in any recovery, and to recovery reasonable costs, expenses, and attorney's fees from a defendant if the action is successful.

### III.     Defendant's Misconduct

**A. Defendant filed claims for services performed by unqualified personnel.**

27.     Defendant knowingly filed false claims for medical services performed by unqualified personnel with fabricated certifications.

28.     On information and belief, these false claims began before 2014 and continue through the present.

29.     In 2014, before Escambia County hired Dr. Edler, Dr. Edler worked in the emergency room at Baptist Hospital, Pensacola. Dr. Edler had concerns about the

County's emergency services and quality control following a failure in patient care that ended in the patient's death.

30.     An Escambia County paramedic had called Baptist hospital, and Dr. Edler answered the call. The patient had been vomiting blood and the paramedic witnessed a cardiac arrest. The paramedic had attempted resuscitation in the patient's home but failed to recognize or provide the critical care required for her survival. The paramedic spoke with Dr. Edler for physician-approval to pronounce this patient dead. In Dr. Edler's medical opinion, the patient most likely had a gastrointestinal bleed, and properly trained paramedics would have known the patient needed blood for survival.

31.     Dr. Edler reported the incident to the paramedic's supervisor, Karen Wood. But rather than looking into the incident, Ms. Wood filed a complaint about Dr. Edler with the hospital and with the county's then-Medical Director, Dr. Neal. In response to the complaint, on July 19, 2014, Dr. Edler emailed Dr. Neil expressing her concerns regarding patient care. Dr. Neil did not respond.

32.     In another 2014 death also related to improper training, Aubrey Nichols, a singer in a local band Timberhawk, suffered a cardiac arrest from a heart defect. To help him breathe, paramedics inserted an endotracheal tube.

33.    This procedure, called *endotracheal* intubation, is considered routine for properly trained emergency personnel. Paramedics learn the procedure in the required training for Advanced Cardiac Life Support (ACLS).

34.    But instead of properly inserting the tube which would direct air flow to the patient's lungs, they improperly inserted the tube and it forced air into his stomach.

35.    This is called *esophageal* intubation. Properly trained paramedics learn to recognize this by measuring the end-tidal $CO_2$ and are trained to observe intubated patients for:

· Bilateral, equal breath sounds
· Bilateral chest wall movements
· Absence of breath sounds / gurgling over the stomach / epigastrium
· Fogging of the endotracheal tube
· Tube / cuff palpation in the neck or suprasternal notch
· Cyanosis, or its disappearance (a bluish cast to the skin and mucous membranes).

36.    Failure to identify intubation as *esophageal* rather than *endotracheal* is often catastrophic, as it was for Mr. Nichols.

37.    In Dr. Edler's opinion, had the paramedics been properly trained to observe for signs of esophageal intubation Mr. Nichols might be alive. His mother, a nurse, learned of this mistake only because the hospital charged for a second intubation, but by then the lack of oxygen had caused his brain death.

38.    Around May 2016, just before he retired, former EMS Chief Patrick "Pat" Kostic demoted James Bonoyer, former Captain in Charge of Training. But Chief

Kostic's replacement, Stephen White, former Chief of EMS operation, reinstated Bonoyer. As discussed below, in 2020, Florida Department of Law Enforcement arrested Bonoyer and White and charged them with multiple crimes relating to the falsification of training certifications.

39.     On information and belief in the first part of 2017, the County paid approximately $300,000 in reimbursements to Medicare and private insurance companies for claims filed for one or more EMTs without proper certifications. But the County failed to identify all staff without certifications and to report those false claims. *Consequently, these reimbursements were understated.*

40.     In 2017, Dr. Edler learned of two more deaths resulting from Escambia County EMS training/certification deficiencies and again brought them to the attention of County administration. As later reported by The Pensacola News Journal:

> Sean Harris, 28, was five days away from his wedding when he died in a hospital bed on May 16, 2017.  … He was struck by an SUV the night before while out with his friends celebrating his bachelor party.[2]

41.     The response by Escambia County Emergency Medical Services was captured on video and Mr. Harris' mother, Nurse Dawn Bybee, showed the video to Dr. Edler. Dr. Edler identified training-deficient care in the video which showed EMS crew lifting Mr. Harris and Mr. Surgner (a passenger) to check their pulses,

---

[2]     https://www.pnj.com/story/news/2019/04/30/escambia-county-ems-nurse-fights-change-after-video-sons-care-crash/3586888002/

without taking care to protect their necks (routine cervical immobilization), then failing to open their airways, and even allowing Mr. Surgner to flop on the ground. Both men died.

42.     Mrs. Bybee attempted to reach out to EMS administration, Steve White, Kate Kenney, and Leon Salter, but there was no response and nothing was done. Mrs. Bybee then scheduled two meetings with County administration and asked Dr. Edler to accompany her. During those meetings Dr. Edler met County Administrator Brown and learned the County would soon have an open position for medical director.

43.     On information and belief, the County was aware of Emergency Services' deficiencies, including substandard care resulting from violations of protocols and procedures and lack of training.

44.     In May 2018, Escambia County hired Dr. Edler as its Medical Director. She understood her responsibilities to include ensuring quality of care with emergency and non-emergency medical transportation and services.

45.     From the outset, emergency service management sought to undermine Dr. Edler's authority by characterizing her as an "independent" and outside the emergency services chain of command.

46.     On June 6, Steve White, Chief of the Emergency Medical Services, sent her a lengthy email, "Chain of Command and Employee Engagement," copying his

11

leadership team, limiting her role in the name of "working in harmony." Later that day, Dr. Edler emailed Matthew Coughlin, detailing why she disagreed with this limitation of her role. Although she had not recognized this at the time, later Dr. Edler came to understand that she was hired not for her medical skills, knowledge and experience, but for her license. As discussed below, Mr. White is one of the four Escambia personnel arrested in 2020 and charged with crimes relating to falsifications and deficiencies Dr. Edler identified and attempted to address.

47.     On June 18, 2018, Dr. Edler emailed Eric Kleinert (HR Director) to schedule an appointment and then on June 20 met with him and Paulette Stallworth, with her concerns and incident reports relating to "to protocol violations, insubordination, falsifying certifications, policy updates, employee files, and the work environment at public safety."

48.     A few days later, on June 21, Dr. Edler learned of more forged documents from Jessica Tanksley. Ms. Tanksley reported to Dr. Edler that she had received her pediatric emergency card without taking the class, and that others were not getting certified in more advanced pediatric classes because the County medical equipment is "subpar."

49.     On June 22, Dr. Edler emailed Eric Kleinert, HR Director, about the County's Training Center's falsification of certifications.

50.     Dr. Edler's meetings and emails implicated administration and staff in the

Department of Public Safety, including James Bonoyer, former Captain in charge of

training, quality assurance; Stephen White, former Chief of EMS operation; former

Section Chief Kate Kenney; and Lawrence Salter, Jr., former deputy chief of EMS

Operations. In response, all four of these management personnel immediately filed

harassment charges against Dr. Edler. As discussed below, in 2020 all four were

arrested and charged with crimes relating to the falsifications and deficiencies Dr.

Edler had identified and attempted to address.

51.     On June 25, Dr. Edler met with Robert Dye, Risk Manager and Interim

Director of Facilities, to discuss her concerns with falsifying certifications, protocol

violations, and substantial noncompliance with state laws and regulations that

risked patient harm.

52.     On June 26, Dr. Edler emailed Jack Brown, Matthew Coughlin, and Mike

Weaver, further expanding on these issues in a detailed email (approximately 1,500

words), header "Office of Administration, Professional Standards and Community

Engagement."

53.     On December 13, 2018, in response to Fire Chief Nail's inquiries about

medical marijuana, Dr. Edler replied, copying others, her concerns about medical

marijuana and prescribed narcotics used by EMTs and medics, and her opposition to

13

having them risk patients' lives "while under the influence of medications that cause sedation, poor judgment, and delayed response time."

54.    On December 21, Dr. Edler learned from James Robinson, Assistant Chief of the Denver Health Paramedic Division, that Denver had a no-tolerance approach to medical marijuana use by EMS personnel because a large part of their funding comes from Medicare.

> Because marijuana is still illegal at the federal level, we have taken a no-tolerance approach with employees. As with most EMS agencies, a large part of our funding comes from Medicare via CMS and we cannot risk that. … Obviously, it is not permissible for use on duty.

December 21 email from James Robinson, Assistant Chief, Denver.

55.    That same day, December 21, Dr. Edler forwarded Assistant Chief Robinson's "no-tolerance" email to Escambia management personnel.

56.    These and other emails, meetings, and calls during 2018 identified:

- Deficiencies and noncompliance with state regulations;
- Out-of-date policies and missing policy and procedure manuals;
- Personnel falsely placing Dr. Edler's name on certifications for EMTs;
- Distribution of fraudulent certifications;
- Out of date equipment, such as an ambulance with portable ventilators and IV pumps that were not calibrated, or were out-of-service; and
- Patient risks and Medicare false claims relating to medical marijuana used by an EMT.

57.    Dr. Edler reported these to her superiors and others in Escambia County Administration.

14

58.    Curing these deficiencies required training and equipment and on January

2019, Fire Chief Rusty C. Nail drafted a proposal for an emergency request for

funding, noting "this is extremely time sensitive, as I feel the normal procurement

process will increase our likelihood of negative outcomes in the interim timeframe."

59.    During the early months of her employment, when Dr. Edler disputed the

constraints put on her medical authority she was not aware of the legal requirements

for a County's medical director. However, around late February or early March

2019, Dr. Edler learned that Florida Statutes set forth responsibilities for medical

directors. *See* § 401.265 (Medical Director responsibilities). *See In Re Miami-Dade*

*Fire Rescue*, DOH 2007–0102, Final Order Granting Petition for Declaratory

Statement, (relating to medical director's scope of authority over paramedics and

emergency medical technicians). *See generally* Florida Statute, Ch. 401, Medical

Telecommunications and Transportation.

60.    Dr. Edler also learned Escambia County's Emergency Medical Service

operates under the supervision of the Florida Department of Health, Bureau of

Emergency Medical Services, within the framework of the Emergency Medical

Transportation Services Act. *See* Fla. Stat. §401.2101, *et seq.*

61.    On March 18, 2019, Dr. Edler wrote a confidential report to the Florida

Department of Health detailing her concerns, including violations of §§ 401.411

(licensure violations) and 401.265 (Medical Director responsibilities).

62. On May 8, 2019, EMS investigator Kimberly Moore, Florida Department of Health, Division of Emergency Preparedness and Community Support, notified the County of an investigation of the issues raised by Dr. Edler.

63. On May 9, Dr. Edler wrote the County Commission detailing the harms from the Commission's failure to fund training and attached a statement she sought the commissioners to sign labeled "AGAINST MEDICAL ADVICE – ACKNOWLEDGMENT AND WAIVER" (all caps original) which included this warning:

> Failure to proceed forward with this initiative on an EMERGENCY request exposes the citizens and visitors of Escambia County to a higher than necessary risk of substandard emergency medical care. Liability increases exponentially each day this request is delayed.

64. The complaints detailed violations, including falsified records:

- October 18, 2017: ACLS, BLS, and PALS provider cards issued to Mr. Salter despite there being no roster to confirm his attendance at any of these courses.
- November 1, 2017: ACLS and BLS provider cards issued to Ms. Wood with no roster or course to confirm her attendance.
- January 18, 2018: Mr. Slater, Ms. Kenney, and Mr. White documented in their record/log that they taught Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) courses. However, they were not on the roster and did not assist with these courses.

- February 1, 2018: ACLS, BLS, and PALS provider cards were issued to Ms. Kenny despite there being no roster to confirm her attendance at any of these courses.
- March 13, 2018: Jim Bonoyer, Training Center Coordinator, listed as assistant instructor for a Pediatric Advanced Life Support (PALS) instruction course. Similarly, Steve White, Chief of EMS Operations, Katherine Kenny, Chief of Administration, Professional Standards and Community Engagement, and Leon Salter, Deputy Chief of EMS Operations. But none of these individuals assisted or even attended the course.
- May 1, 2018: ACLS and BLS provider cards were issued to Mr. White despite there being no roster to confirm his attendance at any of these courses.
- June 13, 2018: Mr. White was issue a PALS provider card dated June 13, 2018, despite there being no course offered on this day. Additionally, there was no roster or test to verify this credential.

65. On May 13, 2019, Dr. Edler filed another confidential complaint with the Florida Department of Health.

66. Both complaints were leaked to her superiors which resulted in retaliation and harassment against Dr. Edler including two official formal "counseling notifications" in June 2019.

67. The first "counseling notification," on June 7, followed immediately after Dr. Edler's identification of criminal and civil violations. Escambia disciplined Dr. Edler for her lack of leadership and poor communications.

17

68. On July 9, 2019, John Dosh wrote to Edler rejecting her recommendation to demote the unqualified paramedic Selover.

69. Despite the leaked complaints and the knowledge of the falsifications by upper-level administration and management, the falsification of credentialing documents continued, *e.g.* July 19, 2018 for Ms. Wood's ACLS and BLS.

70. Harassment encouraged at the highest levels continued against Dr. Edler. On January 27, 2020, Dr. Edler wrote Sgt. Jerry Champion and others about County Commissioner Bergosh's writing on his blog attempting to protect Mr. Selover and encouraging litigation against Dr. Edler. For example, employee Ms. Chavers had reported that Mr. Selover had encouraged her to file a false harassment/retaliation claim against Dr. Edler. When Ms. Chavers refused to file a false report, Commissioner Bergosh posted personal information about her on his blog.

71. In February 2020, the Florida Department of Health notified Escambia County of an administrative complaint against Escambia County Public Safety Department. Case 2019-11689. The complaint alleged departure from minimal prevailing standards of acceptable practice for emergency medical technicians, paramedics, healthcare professionals, and other professionals not qualified by training or experience. § 401.411(1)(g), Fla. Stat. The complaint alleged that Escambia's Public Safety Department issued recertification cards to instructors who had not met the requirements for re-certifications. These certifications included:

Advanced Cardiac Life Support (ACLS), Basic Life Support (BLS), Pediatric Advanced Life Support (PLS), and Pediatric Emergency Assessment Recognition And Stabilization (PEARS).

72.    Dr. Edler's complaint to the Department of Health also initiated investigations by the Florida Department of Law enforcement. In March 2020, this investigation resulted in arrests and charges of these former Department of Public Safety officers:

- James Bonoyer, former Captain in Charge of Training: one count of Racketeering, a first-degree felony; 23 counts of official misconduct, a third-degree felony; 20 counts of forgery, a third-degree felony; and 13 counts of paramedic license fraud, a first-degree misdemeanor.
- Kate Kenney, former Section Chief and paramedic supervisor: one count of racketeering, a first-degree felony; five counts of Official Misconduct, a third-degree felony; five counts of Uttering a Forged Instrument, a third-degree felony; and four counts of paramedic license fraud, a first-degree misdemeanor.
- Lawrence Salter, Jr., former Deputy Chief of EMS Operations: three counts of official misconduct, a third-degree felony; three counts of uttering a forged instrument, a third-degree felony; and two counts of paramedic license fraud, a first-degree misdemeanor.
- Stephen White, former Chief of EMS operation: one count of racketeering, a first-degree felony; eight counts of official misconduct, a third-degree felony; six counts of uttering a forged instrument, a third-degree felony; and two counts of paramedic license fraud, a first-degree misdemeanor.

73.   A March 24, 2020 article on the arrests reported Dr. Edler's role as the

original source of the information leading to these arrests.

> State Attorney Bill Eddins said the arrests are the result of a detailed
> and lengthy investigation by the Florida Department of Law
> Enforcement into the alleged falsification of official records of the
> Escambia County Department of Public Safety. *The investigation
> began after a 2019 letter from Escambia County Medical Director Dr.
> Rayme Edler.*

http://www.northescambia.com/2020/03/breaking-four-arrests-in-escambia-county-

ems-investigation (emphasis added).

## B. Defendant acted "knowingly" when it certified compliance.

74.   The FCA defines "knowingly" as follows:

> the terms "knowing" and "knowingly" mean that a person, with respect
> to information-- (i) has actual knowledge of the information; (ii) acts in
> deliberate ignorance of the truth or falsity of the information; or (iii)
> acts in reckless disregard of the truth or falsity of the information; and
> no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

75.   Escambia knowingly presented or caused to be presented these claims for

services with actual knowledge of their falsity, or in deliberate ignorance or reckless

disregard that such claims were false and fraudulent.

## C. Defendant files claims.

76.   During the years 2014 through 2017, Medicare part B reimbursed Defendant

approximately $4.6 million per year for codes A0425 through A0434. On

information and belief, this level of reimbursement continues to the present.

20

77. Defendant also files Medicaid, TRICARE and CHAMPVA claims. Relator does not know the amount of these claims, but estimates the federal government's portion of Medicaid falls in the same order of magnitude as the annual $4.6 million Medicare claims.

78. Relator does not allege that all of the County's claims are false. Documentary evidence necessary to identify the fraudulent claims is in the possession of Defendant and the United States.

**D. Escambia County retaliated against Dr. Edler.**

79. Relator opposed Defendant's illegal practices. She voiced her views to her superiors and others on multiple occasions. As a result of Relator's identification and bringing to light the civil and criminal violations described above, Relator has experienced retaliation, intimidation, and harassment.

80. Defendant knew or should have known that Relator engaged in the protected activity.

81. Relator's reporting of the illegal conduct was both lawful and a protected activity under 31 U.S.C. § 3730(h).

82. As a direct and immediate consequence of Defendant's actions and failures to act, Dr. Edler has been harmed and is entitled to obtain relief in her own right under 31 U.S.C. § 3730(h).

## IV.   Count I: False Are Fraudulent Claims

### A. Submission of false claims, 31 U.S.C. § 3729(a)(1)(A).

Relator incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

83.    Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, acting through the Medicare and Medicaid programs.

84.    By virtue of the false or fraudulent claims presented or caused to be presented by Defendant, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916. 28 C.F.R. § 85.3(a)(9).

### B. Use of false records or statements, 31 U.S.C. § 3729(a)(1)(B).

Relator incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

85.    Defendant knowingly made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the United States for reimbursement.

86.   By virtue of the false or fraudulent claims presented or caused to be presented by Defendant, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916. 28 C.F.R. § 85.3(a)(9).

**C. Unlawful retaliation against Dr. Edler, 31 U.S.C. § 3730(h).**

Relator incorporates by reference all paragraphs of this complaint as if fully set forth herein.

87.   Relator's reporting of unlawful conduct resulted in retaliation for protected acts taken by Relator to report violations of the False Claims Act and in retaliation for other lawful acts taken by Relator in furtherance of an action under the False Claims Act and/or the reporting of unlawful conduct.

88.   County administration who took part in this retaliation include:

- Bergosh, Jeffrey, Commissioner,
- Coughlin, Matt, Interim County Administrator, Escambia County,
- Dosh, John, Public Safety Director, Escambia County,
- Kleinert, Eric, Human Resources Director of Escambia County,
- Lovoy, Amy, Interim County Administrator,
- Peppler, Charles V., Deputy County Attorney,
- Rogers, Alison, County Attorney,

- Salter, Leon, Deputy Chief of Escambia Emergency Medical Services,
- Spainhower, Edward, Human Resources Associate, and
- Weaver, Mike, Public Safety Director of Escambia County.

89.    Defendant's retaliatory acts have proximately caused Relator to suffer and to continue to suffer substantial damage, including special damages, in an amount to be proven at trial.

90.    As a direct and immediate consequence of the County's actions and failures to act, Dr. Edler has been harmed and is entitled to obtain relief in her own right under 31 U.S.C. § 3730(h)

## V.    Prayer For Relief

WHEREFORE, Relator requests that judgment be entered against Defendant, ordering:

A.    Defendant pay the United States not less than $5,500 and not more than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990) for each violation of 31 U.S.C. § 3729 occurring before November 2, 2015, plus three times the amount of damages the United States has sustained;

B.    Defendants pay the United States not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729 occurring on or after November 2, 2015, plus three times the amount of damages the United States has sustained;

C.   Relator be awarded the maximum relator's share allowable pursuant to 31
U.S.C. § 3730(d);

D.   Relator be awarded all costs of this action, including attorneys' fees and
costs, pursuant to 31 U.S.C. § 3730(d) and any other applicable law or
regulation;

E.   The United States and Relator be awarded such other, further, or different
relief as the Court deems just and proper.

Plaintiff requests trial by jury.

Respectfully submitted

/s/ Jonathan Kroner                          Philip J. Boudousqué
FBN 328677                                   Philip J. Boudousqué, PLC
Jonathan Kroner Law Office                   3621 Ridge Lake Dr., Suite 207A
300 S. Biscayne Blvd., Suite 3710            Metaire, LA 70002
Miami, Florida 33131                         504.832.0006
305.310.6046                                 PJBAPLC@gmail.com
jk@FloridaFalseClaim.com                     *pro hac vice* to be applied for

Attorneys for *Qui Tam* Plaintiff Relator Rayme M. Edler, M.D.

**UNITED STATES POSTAL SERVICE**

U.S. POSTAGE PAID
PME 1-Day
MIAMI, FL
33131
MAY 28, 20
AMOUNT
**$26.35**
R2305H128175-9

EJ 310 739 117 US

32502

1007

**PRESS FIRMLY TO SEAL**

**UNITED STATES POSTAL SERVICE®** | **PRIORITY MAIL EXPRESS®**

FROM: (PLEASE PRINT)   PHONE (    )

Jonathan Kroner Law Office
300 S. Biscayne Blvd #3710
Miami, FL 33131

TO: (PLEASE PRINT)   PHONE (    )

Clerk of Court
Attn: SEAL CLERK
US Court House
1 N PALAFOX St.
PENSACOLA, FL
32502-5665

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

**PRIORITY MAIL EXPRESS™**
★ ★ ★
OUR FASTEST SERVICE IN THE U.S.

RECEIVED APR 29 2023

EP13F July 2013   OD: 12.5 x 9.5

PS10001000006

This envelope is made from post-consumer waste. Please recycle - again.

USPS CORPORATE ACCT. NO.

ORIGIN (PO/ZIP CODE)
PO ZIP Code: 33131
Scheduled Delivery Date: 5/29/2023
Postage: $26.35

Date Accepted: 5/29/2023
Scheduled Delivery Time: □ 10:30 AM □ 3:00 PM □ 12 NOON
Insurance Fee:

Time Accepted: 2:40 □ AM ■ PM
10:30 AM Delivery Fee:
Return Receipt Fee:

Weight: □ Flat Rate 1 2.5 Oz
Total Postage & Fees: $26.35

DELIVERY (POSTAL SERVICE USE ONLY)

LABEL 11-B, MARCH 2019