IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**United States of America**
*ex rel.* **Rayme M. Edler, M.D.**

**Plaintiffs,**
**v.**                                          **Case 3:20-cv-05503-RV-HTC**

**Escambia County**                             **FILED UNDER SEAL**
                                                **31 U.S.C. §3730(B)(2) AND**
**Defendant.**                                  **LOCAL RULE 5.5 (B)**
_____ /

## SECOND AMENDED COMPLAINT

1.      Plaintiff-Relator Dr. Edler brings this False Claims Act Complaint on

behalf of the United States, and on her own behalf. 31 U.S.C. §§ 3730 *et seq.*

2.      Medicare and other government programs pay for certain necessary

and reasonable medical services, but services are not reasonable when they are

performed by uncertified and unqualified personnel. Escambia County knowingly

filed claims for medical services performed by uncertified and unqualified

personnel.

3.      Further, Escambia knowingly filed claims for emergency transportation

when it provided non-emergency transportation, and it filed claims for advanced life

support when if provided basic life. These up-codes are false claims.


FILED USDC FLND PN
SEP 28 '22 PM 2:57

1

## I. Jurisdiction, Venue, and Parties

4.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. §

3732(a) and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The

Court has personal jurisdiction over Escambia because it transacts business and can

be found in this district and committed acts in this district that violate 31 U.S.C. §

3729.

5.     To the extent that there has been a public disclosure of "allegations or

transactions" in this Complaint, the Relator is the original source under 31 U.S.C.

§3730(e)(4). Relator has direct, independent, and material knowledge of the

information that forms the basis of this Complaint and voluntarily disclosed that

information to the Government before filing.

6.     Venue is proper in this district under 31 U.S.C. § 3732(a) because at all

times relevant to this Complaint, Defendant regularly conducted substantial

business within this district.

7.     Defendant's conduct had a material effect on government-funded

health plans' decisions to pay for services performed by Defendant. Had the United

States known that Defendant misrepresented the schemes described herein,

government-funded health plans would not have paid or made reimbursements.

8.     **Qui Tam Plaintiff/Relator Rayme Edler, MD, MSPH,** Florida

license ME109913, was employed as the Escambia County Medical Director and

Director of Emergency Medical Services from May 2018 until she was unlawfully terminated on September 27, 2021.

9.      Dr. Edler's responsibilities included providing medical direction and oversight for Escambia County's Public Safety and Correctional Center. This includes

- Escambia County Emergency Medical Services,
- Escambia County Fire Rescue,
- Escambia County Dispatch,
- Pensacola City Fire,
- Pensacola Beach Lifeguards,
- Medical staff at the Escambia County Correctional Center and Road Prison,
- National Park Rangers who are EMTs and Paramedics in Fort Pickens, Fort McRee, Johnson Beach, and Opal Beach (medical oversight only).[1]

10.     Dr. Edler's experience made her exceptionally well-suited for this position. During college she worked as a New Orleans-based EMT/Paramedic, including work as a paramedic supervisor on for Lifeguard Ambulance Service. Then, while studying for her Masters in Public Health, she worked at Charity Hospital, New Orleans. After earning her M.D. in 2007, she served emergency department patients.

11.     In addition, from July 2011 until the present, Dr. Edler works as an emergency medicine board-certified physician for ApolloMD at Baptist Hospital, Pensacola, FL and Gulf Breeze Hospital, Gulf Breeze, FL.

---

[1] Defendant has a service agreement with the National Park Services.

12. Relator's licenses and certifications:

· Florida Medical License, ME109913. Active: 01/31/2023.

· Advanced Trauma Life Support, active since 2004.

· Advanced Cardiac Life Support instructor-EP (Experienced Provider).

· Pediatric Advanced Life Support.

· Basic Life Support Provider.

· American Board of Emergency Medicine. Expiration: 12/2021.

· Basic SWAT Medic Course Completion.

13. With respect to allegations made upon information and belief, Relator has, based upon Relator's knowledge, data, and prior experience, a reasoned factual basis to make the allegations herein but lacks complete details of them. While Relator has significant evidence of the fraud alleged herein (the details of which follow), much of the documentary evidence necessary to prove these allegations is in the possession of Defendant and the United States.

14. **Defendant Escambia County,** NPI 1518960426, provides healthcare services, including emergency medical services and transportation.

15. The state of Florida Dept. of Health license verification shows the Escambia County Public Safety Department EMS is an EMS service provider with an advanced life support license ALS 1703, issued in 1992.

4

16.     Escambia County has a population of approximately 300,000, and 2022 budget of $ 568,262,165.[2]

## II. The Law

### A.     Medicare and government programs.

17.     The false claims complained of herein arise from services provided under the United States governments' Medicare, Medicaid, ChampVA (f/k/a Champus), Tricare, and other federal employee and veteran healthcare programs.

18.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. The Center for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services, administers Medicare.

19.     To participate in the Medicare program, healthcare providers enter into contracts with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations.

20.     Among the most crucial legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts

---

[2] Fiscal Year 2022 – 2023 Proposed Budget, p. 7 https://myescambia.com/docs/default-source/budget/FY23-Proposed-Budget-Book-.pdf [last accessed August 29, 2022].

concerning payment requests. 42 U.S.C. §§ 1320a-7b(a)(1)-(2); 42 C.F.R. 413.24(f)(4)(iv).

21.    Each of the federally funded health-care programs requires every provider who seeks payment from the program to "enroll" and sign Provider Agreements in order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs. 42 C.F.R. § 424.500 *et seq*. As part of these agreements, without which the provider may not seek reimbursement from federal health-care programs, the provider certifies compliance with Medicare laws, regulations, and program instructions.

22.    TRICARE/CHAMPVA is a federally-funded program that provides civilian health benefits, including hospital services, to U.S Armed Forces military personnel, military retirees, and their dependents, including some reservists. Reimbursement from TRICARE/CHAMPUS also requires certifications similar to those required for Medicare reimbursement. Consequently, whenever a Medicare submission contains false data or information, the corresponding reimbursement requests submitted to TRICARE/CHAMPUS are also false.

**B.   Medicare's Reimbursement for Ambulance Transportation and Services**

23.   Medicare reimburses medically necessary ambulance transportation.

24.   Medicare requires ambulance providers to code their claims to reflect whether the transportation is emergency or not, and whether it requires advanced or basic life support.[3]

Non-Emergency ambulance services
     A0426     Advanced life support, level 1
     A0428     Basic life support,

Emergency ambulance services
     A0427     Advanced life support, level 1
     A0429     Basic life support.

25.   The government, through its various healthcare programs, pays more for emergencies than for nonemergencies, and it pays more for "advanced" life support services than for "basic" services

26.   As described in more detail below, Escambia unlawfully up-coded its ambulance services claims so as to charge the government for emergency services when only non-emergency services were provided and, separately, to charge the government for advanced services when only basic services were provided.

27.   Federal law defines "emergency response":

---

[3]   Additional codes include:
- A0433, Advanced life support, level 2, (not designated emergency or nonemergency),
- A0434, Specialty care transport,
- A0425, Ground mileage (same rate for emergency, nonemergency, basic and advanced).

> *Emergency response* means responding immediately at the BLS or ALS1 level of service to a 911 call or the equivalent in areas without a 911 call system. An immediate response is one in which the ambulance entity begins *as quickly as possible* to take the steps necessary to respond to the call.

42 C.F.R. § 414.605 Definitions. (Emphasis added.) [4]

28. Federal law distinguishes *advanced* from *basic* life support services and defines advanced as:

> Advanced life support (ALS) assessment is an assessment performed by an ALS crew as part of an emergency response that was necessary because the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment. An ALS assessment does not necessarily result in a determination that the patient requires an ALS level of service.

> Advanced life support (ALS) intervention means a procedure that is, in accordance with State and local laws, required to be furnished by ALS personnel.

> Advanced life support, level 1 (ALS1) means transportation by ground ambulance vehicle, medically necessary supplies and services and either an ALS assessment by ALS personnel or the provision of at least one ALS intervention.

42 C.F.R. § 414.605

29. Federal law adopts state and local law. 42 C.F.R. § 414.605.

30. Florida's definition of "Advanced Life Support" adopts national standards and further details specific skills and techniques.

---

[4] This is a legislative rule with the force of law because Medicare reimburses ambulance service providers "*only to the extent provided in regulations*." 42 U.S.C. § 1395x(s)(7) (emphasis added). *See Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (defining and distinguishing legislative from interpretative rules).

401.23 Definitions.—As used in this part, the term:

(1) "Advanced life support" means assessment or treatment by a person qualified under this part through the use of techniques such as endotracheal intubation, the administration of drugs or intravenous fluids, telemetry, cardiac monitoring, cardiac defibrillation, and other techniques described in the EMT-Paramedic National Standard Curriculum or the National EMS Education Standards, pursuant to rules of the department.

Fla. Stat. § 401.23; *See also* § 401.23(2) (defining advanced life support service), and § 401.23(7) and (8) (defining basic life support and basically support service).

31.    CMS contemplated and specifically notified providers that

"Compliance with ... Emergency and Non-Emergency Ground Ambulance Services may be monitored and addressed through post payment data analysis ...." Billing and Coding: Emergency and Non-Emergency Ground Ambulance Services [5]

32.    Medicare law obligates providers to provide services only to the extent they are medically necessary, and only to the extent they are supported by evidence of medical necessity. 42 U.S.C. § 1320c-5(a)(l) and (3).

### C.    The False Claims Act.

33.    With the enactment of the federal False Claims Act, Congress recognized the benefits of incentivizing integrity and repeatedly amended the Act to further enhance the ability of the U.S. Government to recover losses to the federal treasury sustained as a result of fraud.

---

[5]  Local Coverage Article A57674 https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57674&ver=5    *Whitcomb v. Burwell, Docket* No. 13-CV-990, 2015 U.S. Dist. LEXIS 119875, at *5 (E.D. Wis. Sep. 9, 2015)"

34. Congress intended that the False Claims Act amendments enhance incentives for individuals with knowledge of fraud against the federal government and encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

35. Congress has found that fraud in federal programs is pervasive and has recognized the False Claims Act as the government's primary tool for combating government fraud.

36. The False Claims Act prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money. 31 U.S.C. §§ 3729-3733.

37. The Act allows any person having knowledge about a false or fraudulent claim against the government to bring an action, to share in any recovery, and to recovery reasonable costs, expenses, and attorney's fees from a defendant if the action is successful.

### III. Defendant's Certification-related Misconduct

#### A. Defendant filed claims for services performed by unqualified personnel.

38. Defendant knowingly filed false claims for medical services performed by unqualified personnel with fabricated certifications.

39. On information and belief, these false claims began before 2014 and continue through the present.

40.    In 2014, before Escambia County hired Dr. Edler, Dr. Edler worked in the emergency room at Baptist Hospital, Pensacola. Dr. Edler had concerns about the County's emergency services and quality control following a failure in patient care that ended in the patient's death.

41.    An Escambia County paramedic had called Baptist hospital, and Dr. Edler answered the call. The patient had been vomiting blood and the paramedic witnessed a cardiac arrest. The paramedic had attempted resuscitation in the patient's home but failed to recognize or provide the critical care required for her survival. The paramedic spoke with Dr. Edler for physician-approval to pronounce this patient dead. In Dr. Edler's medical opinion, the patient most likely had a gastrointestinal bleed, and properly trained paramedics would have known the patient needed blood for survival.

42.    Dr. Edler reported the incident to the paramedic's supervisor, Karen Wood. But rather than looking into the incident, Ms. Wood filed a complaint about Dr. Edler with the hospital and with the county's then-Medical Director, Dr. Neal. In response to the complaint, on July 19, 2014, Dr. Edler emailed Dr. Neil expressing her concerns regarding patient care. Dr. Neil did not respond.

43.    In another 2014 death also related to improper training, Aubrey Nichols, a singer in a local band Timberhawk, suffered a cardiac arrest from a heart defect. To help him breathe, paramedics inserted an endotracheal tube.

44.     This procedure, called endotracheal intubation, is considered routine for properly trained emergency personnel. Paramedics learn the procedure in the required training for Advanced Cardiac Life Support (ACLS).

45.     But instead of properly inserting the tube which would direct air flow to the patient's lungs, they improperly inserted the tube and it forced air into his stomach.

46.     This is called *esophageal* intubation. Properly trained paramedics learn to recognize this by monitoring the patient's oxygen saturation, measuring the end-tidal $CO_2$ and are trained to observe intubated patients for:

- Bilateral, equal breath sounds
- Bilateral chest wall movements
- Absence of breath sounds / gurgling over the stomach / epigastrium
- Fogging of the endotracheal tube
- Tube / cuff palpation in the neck or suprasternal notch
- Cyanosis, or its disappearance (a bluish cast to the skin and mucous membranes).

47.     Failure to identify intubation as *esophageal* rather than *endotracheal* is often catastrophic, as it was for Mr. Nichols.

48.     In Dr. Edler's opinion, had the paramedics been properly trained to observe for signs of esophageal intubation Mr. Nichols might be alive. His mother, a nurse, learned of this mistake only because the hospital charged for a second intubation, but by then the lack of oxygen had caused his brain death.

49.     Around May 2016, just before he retired, former EMS Chief Patrick "Pat" Kostic demoted James Bonoyer, former Captain in Charge of Training. But Chief Kostic's replacement, Stephen White, former Chief of EMS operation, reinstated Bonoyer. As discussed below, in 2020, Florida Department of Law Enforcement arrested Bonoyer and White and charged them with multiple crimes relating to the falsification of training certifications.

50.     On information and belief in the first part of 2017, the County paid approximately $300,000 in reimbursements to Medicare and private insurance companies for claims filed for one or more EMTs without proper certifications. But the County failed to identify all staff without certifications and to report those false claims. *Consequently, these reimbursements were understated.*

51.     In 2017, Dr. Edler learned of two more deaths resulting from EMS training/certification deficiencies and again brought them to the attention of County administration. As later reported by The Pensacola News Journal:

> Sean Harris, 28, was five days away from his wedding when he died in a hospital bed on May 16, 2017. … He was struck by an SUV the night before while out with his friends celebrating his bachelor party.[6]

52.     The response by Escambia County Emergency Medical Services was captured on video and Mr. Harris' mother, Nurse Dawn Bybee, showed the video to

---

[6]     https://www.pnj.com/story/news/2019/04/30/escambia-county-ems-nurse-fights-change-after-video-sons-care-crash/3586888002/

Dr. Edler. Dr. Edler identified training-deficient care in the video which showed EMS crew lifting Mr. Harris and Mr. Surgner (a passenger) to check their pulses, without taking care to protect their necks (routine cervical immobilization), then failing to open their airways, and even allowing Mr. Surgner to flop on the ground. Both men died.

53.     Mrs. Bybee attempted to reach out to EMS administration, Steve White, Kate Kenney, and Leon Salter, but there was no response and nothing was done. Mrs. Bybee then scheduled two meetings with County administration and asked Dr. Edler to accompany her. During those meetings Dr. Edler met County Administrator Brown and learned the County would soon have an open position for medical director.

54.     On information and belief, the County was aware of Emergency Services' deficiencies, including substandard care resulting from violations of protocols and procedures and lack of training.

55.     In May 2018, Escambia County hired Dr. Edler as its Medical Director. She understood her responsibilities to include ensuring quality of care with emergency and non-emergency medical transportation and services.

56.     From the outset, emergency service management sought to undermine Dr. Edler's authority by characterizing her as an "independent" and outside the emergency services chain of command.

57.     On June 6, Steve White, Chief of the Emergency Medical Services, sent her a lengthy email, "Chain of Command and Employee Engagement," copying his leadership team, limiting her role in the name of "working in harmony." Later that day, Dr. Edler emailed Matthew Coughlin, detailing why she disagreed with this limitation of her role. Although she had not recognized this at the time, later Dr. Edler came to understand that she was hired not for her medical skills, knowledge and experience, but for her license. As discussed below, Mr. White is one of the four Escambia personnel arrested in 2020 and charged with crimes relating to falsifications and deficiencies Dr. Edler identified and attempted to address.

58.     On June 18, 2018, Dr. Edler emailed Eric Kleinert (HR Director) to schedule an appointment and then on June 20 met with him and Paulette Stallworth, with her concerns and incident reports relating to "to protocol violations, insubordination, falsifying certifications, policy updates, employee files, and the work environment at public safety."

59.     A few days later, on June 21, Dr. Edler learned of more forged documents from Jessica Tanksley. Ms. Tanksley reported to Dr. Edler that she had received her pediatric emergency card without taking the class, and that others were not getting certified in more advanced pediatric classes because the County medical equipment is "subpar."

60. On June 22, Dr. Edler emailed Eric Kleinert, HR Director, about the County's Training Center's falsification of certifications.

61. Dr. Edler's meetings and emails implicated administration and staff in the Department of Public Safety, including James Bonoyer, former Captain in charge of training, quality assurance; Stephen White, former Chief of EMS operation; former Section Chief Kate Kenney; and Lawrence Salter, Jr., former deputy chief of EMS Operations. In response, all four of these management personnel immediately filed harassment charges against Dr. Edler. As discussed below, in 2020 all four were arrested and charged with crimes relating to the falsifications and deficiencies Dr. Edler had identified and attempted to address.

62. On June 25, Dr. Edler met with Robert Dye, Risk Manager and Interim Director of Facilities, to discuss her concerns with falsifying certifications, protocol violations, and substantial noncompliance with state laws and regulations that risked patient harm.

63. On June 26, Dr. Edler emailed Jack Brown, Matthew Coughlin, and Mike Weaver, further expanding on these issues in a detailed email (approximately 1,500 words), header "Office of Administration, Professional Standards and Community Engagement."

64. On December 13, 2018, in response to Fire Chief Nail's inquiries about medical marijuana, Dr. Edler replied, copying others, her concerns about medical

marijuana and prescribed narcotics used by EMTs and medics, and her opposition to having them risk patients' lives "while under the influence of medications that cause sedation, poor judgment, and delayed response time."

65. On December 21, Dr. Edler learned from James Robinson, Assistant Chief of the Denver Health Paramedic Division, that Denver had a no-tolerance approach to medical marijuana use by EMS personnel because a large part of their funding comes from Medicare.

> Because marijuana is still illegal at the federal level, we have taken a no-tolerance approach with employees. As with most EMS agencies, a large part of our funding comes from Medicare via CMS and we cannot risk that. … Obviously, it is not permissible for use on duty.

December 21 email from James Robinson, Assistant Chief, Denver.

66. That same day, December 21, Dr. Edler forwarded Assistant Chief Robinson's "no-tolerance" email to Escambia management personnel.

67. These and other emails, meetings, and calls during 2018 identified:

· Deficiencies and noncompliance with state regulations;

· Out-of-date policies and missing policy and procedure manuals;

· Personnel falsely placing Dr. Edler's name on certifications for EMTs;

· Distribution of fraudulent certifications;

· Out of date equipment, such as an ambulance with portable ventilators and IV pumps that were not calibrated, or were out-of-service; and

· Patient risks and Medicare false claims relating to medical marijuana used by an EMT.

68. Dr. Edler reported these to her superiors and others in Escambia County Administration.

69. Curing these deficiencies required training and equipment and on January 2019, Fire Chief Rusty C. Nail drafted a proposal for an emergency request for funding, noting "this is extremely time sensitive, as I feel the normal procurement process will increase our likelihood of negative outcomes in the interim timeframe."

70. During the early months of her employment, when Dr. Edler disputed the constraints put on her medical authority she was not aware of the legal requirements for a County's medical director. However, around late February or early March 2019, Dr. Edler learned that Florida Statutes set forth responsibilities for medical directors. *See* § 401.265 (Medical Director responsibilities). *See In Re Miami-Dade Fire Rescue*, DOH 2007–0102, Final Order Granting Petition for Declaratory Statement, (relating to medical director's scope of authority over paramedics and emergency medical technicians). *See generally* Florida Statute, Ch. 401, Medical Telecommunications and Transportation.

71. Dr. Edler also learned Escambia County's Emergency Medical Service operates under the supervision of the Florida Department of Health, Bureau of Emergency Medical Services, within the framework of the Emergency Medical Transportation Services Act. *See* Fla. Stat. §401.2101, et seq.

72.     On March 18, 2019, Dr. Edler wrote a confidential report to the Florida

Department of Health detailing her concerns, including violations of §§ 401.411

(licensure violations) and 401.265 (Medical Director responsibilities).

73.     On May 8, 2019, EMS investigator Kimberly Moore, Florida

Department of Health, Division of Emergency Preparedness and Community

Support, notified the County of an investigation of the issues raised by Dr. Edler.

74.     On May 9, Dr. Edler wrote the County Commission detailing the harms

from the Commission's failure to fund training and attached a statement she sought

the commissioners to sign labeled "AGAINST MEDICAL ADVICE –

ACKNOWLEDGMENT AND WAIVER" (all caps original) which included this

warning:

> Failure to proceed forward with this initiative on an EMERGENCY
> request exposes the citizens and visitors of Escambia County to a
> higher than necessary risk of substandard emergency medical care.
> Liability increases exponentially each day this request is delayed.

75.     The complaints detailed violations, including falsified records:

·   October 18, 2017: ACLS, BLS, and PALS provider cards issued to Mr.
    Salter despite there being no roster to confirm his attendance at any of these
    courses.

·   November 1, 2017: ACLS and BLS provider cards issued to Ms. Wood with
    no roster or course to confirm her attendance.

·   January 18, 2018: Mr. Salter, Ms. Kenney, and Mr. White documented in
    their record/log that they taught Basic Life Support (BLS) and Advanced

Cardiac Life Support (ACLS) courses. However, they were not on the roster and did not assist with these courses.

· February 1, 2018: ACLS, BLS, and PALS provider cards were issued to Ms. Kenny despite there being no roster to confirm her attendance at any of these courses.

· March 13, 2018: Jim Bonoyer, Training Center Coordinator, listed as assistant instructor for a Pediatric Advanced Life Support (PALS) instruction course. Similarly, Steve White, Chief of EMS Operations, Katherine Kenny, Chief of Administration, Professional Standards and Community Engagement, and Leon Salter, Deputy Chief of EMS Operations. But none of these individuals assisted or even attended the course.

· May 1, 2018: ACLS and BLS provider cards were issued to Mr. White despite there being no roster to confirm his attendance at any of these courses.

· June 13, 2018: Mr. White was issue a PALS provider card dated June 13, 2018, despite there being no course offered on this day. Additionally, there was no roster or test to verify this credential.

76. On May 13, 2019, Dr. Edler filed another confidential complaint with the Florida Department of Health.

77. Dr. Edler notified her supervisor and HR. This resulted in retaliation and harassment against Dr. Edler including two official formal "counseling notifications" in June 2019.

78. The first "counseling notification," on June 7, followed immediately after Dr. Edler's identification of criminal and civil violations. Escambia disciplined

Dr. Edler for her lack of leadership and poor communications but these "reasons" were mere pretext.

79.    On July 9, 2019, John Dosh wrote to Edler rejecting her recommendation to demote paramedic Selover.

80.    Despite the leaked complaints and the knowledge of the falsifications by upper-level administration and management, the falsification of credentialing documents continued, *e.g.*, July 19, 2018 for Ms. Wood's ACLS and BLS.

81.    Harassment encouraged at the highest levels continued against Dr. Edler. On January 27, 2020, Dr. Edler wrote Sgt. Jerry Champion and others about County Commissioner Bergosh's writing on his blog attempting to protect Mr. Selover and encouraging litigation against Dr. Edler. For example, employee Ms. Chavers had reported that Mr. Selover had encouraged her to file a false harassment/retaliation claim against Dr. Edler. When Ms. Chavers refused to file a false report, Commissioner Bergosh posted confidential information about her on his blog.

82.    In February 2020, the Florida Department of Health notified Escambia County of an administrative complaint against Escambia County Public Safety Department. Case 2019-11689. The complaint alleged departure from minimal prevailing standards of acceptable practice for emergency medical technicians, paramedics, healthcare professionals, and other professionals not qualified by

training or experience. § 401.411(1)(g), Fla. Stat. The complaint alleged that

Escambia's Public Safety Department issued recertification cards to instructors who

had not met 22equireements for re-certifications. These certifications included:

Advanced Cardiac Life Support (ACLS), Basic Life Support (BLS), Pediatric

Advanced Life Support (PALS), and Pediatric Emergency Assessment Recognition

and Stabilization (PEARS).

83.    Dr. Edler's complaint to the Department of Health also initiated

investigations by the Florida Department of Law enforcement. In March 2020, this

investigation resulted in arrests and charges of these former Department of Public

Safety officers:

- *Deputy Chief of EMS Operations*, Lawrence Salter, Jr.: three counts of official misconduct, a third-degree felony; three counts of uttering a forged instrument, third-degree felony; and two counts of paramedic license fraud.
- *Captain in Charge of Training*, James Bonoyer: one count of Racketeering, a first-degree felony; 23 counts of official misconduct, a third-degree felony; 20 counts of forgery, a third-degree felony; and 13 counts of paramedic license fraud, a first-degree misdemeanor.
- *Section Chief and paramedic Supervisor*, Kate Kenney: one count of racketeering, a first-degree felony; five counts of Official Misconduct, a third-degree felony; five counts of Uttering a Forged Instrument, a third-degree felony; and four counts of paramedic license fraud.
- *Chief of EMS operation*, Stephen White: one count of racketeering, a first-degree felony; eight counts of official misconduct, a third-degree felony; six

counts of uttering a forged instrument, a third-degree felony; and two counts of paramedic license fraud, a first-degree misdemeanor.

84.    Below is a summary of these executives' charges and adjudications. [7]

| Criminal charges and adjudications against Escambia's EMS Senior Management | Charges | Adjudications: No Contest | Deferred Prosecution, Withheld Adjudication |
|---|---|---|---|
| **Conceal information re medical transportation**, Fla. Stat. 401.41(1)(c) | 2 | | |
| **Official misconduct re false or fraudulent claims** to procure or renew a certificate, Fla. Stat. 401.41(1)(d) | 8 | 2 | 6 |
| **False statements, certifications**, Fla. Stat 403.161(1) | 2 | | 14 |
| **Forgery**, Fla. Stat 831.01 or .02 (felony) | 35 | | |
| Public servant **falsify official documents**, Fla. Stat. 838.022(1)(a) (felony) | 38 | 7 | |
| **Concealing, covering up, destroying, mutilating, or altering any official record or official document**, Fla. Stat. 838.022(1)(b) (felony) | 7 | | |
| **Obstruct, delay comm. involving govt. entity**, Fla. Stat. 838.022(1)(c) (felony) | 2 | | |
| Racketeering, Fla. Stat. 895.03 (felony) | 2 | | 1 |

---

[7]    Regardless of these former employees' criminal convictions for all charges, a " violation of [the False Claims] Act must be established by a mere preponderance of the evidence" *United States v. Entin*, 750 F. Sup. 512, 518 (S.D. Fla. 1990).

85.    A March 24, 2020 article on the arrests reported Dr. Edler's role as the

original source of the information leading to these arrests.

> State Attorney Bill Eddins said the arrests are the result of a detailed and lengthy investigation by the Florida Department of Law Enforcement into the alleged falsification of official records of the Escambia County Department of Public Safety. *The investigation began after a 2019 letter from Escambia County Medical Director Dr. Rayme Edler*.

http://www.northescambia.com/2020/03/breaking-four-arrests-in-escambia-county-ems-investigation (emphasis added).

### B. Defendant acted "knowingly" when it certified compliance.

86.    The FCA defines "knowingly" as follows:

> the terms "knowing" and "knowingly" mean that a person, with respect to informat——- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

87.    Escambia knowingly presented or caused to be presented these claims

for services with actual knowledge of their falsity, or in deliberate ignorance or

reckless disregard that such claims were false and fraudulent.

### C. Defendant files claims.

88.    During the years 2014 through 2020, Medicare part B reimbursed

Defendant approximately $4.6 million per year for codes A0425 through A0434. On

information and belief, this level of reimbursement continues to the present.

89.    Defendant also files Medicaid, TRICARE and CHAMPVA claims. and insurance claims covering Federal employees and their families. Relator does not know the amount of these claims, but estimates the federal government's portion of Medicaid falls in the same order of magnitude as the annual Medicare claims.

90.    Relator does not allege that all of the County's claims are false. Documentary evidence necessary to identify the fraudulent claims is in the possession of Defendant and the United States.

## IV.    Defendant Up-coded claims

91.    The government pays more for emergencies than for non-emergencies, and it pays more for "advanced" life support services than for "basic" services.

92.    Escambia filed claims for emergency services when it rendered only non-emergency services and filed claims for advanced life support despite rendering only basic life support services.

### A. Escambia falsely claims non-emergencies as emergencies.

93.    For the years 2014 through 2020, Medicare Part B reimbursed Escambia, on average, $313 for emergency services and only $199 for non-emergency services (excluding mileage).

*Emergency* Advanced and Basic life support (A0427, A0429)        $313

*Non*-Emergency Advanced and Basic life support (A0426, A0428)        $199

Exhibit 1 at 3.

94. Each false claim Escambia submitted charging the government for an emergency response despite only rendering non-emergency services generated, on average, an additional $114 per claim ($313 – $199). Exhibit 1 at 3.

95. Claims for emergency services when nonemergency services were provided are material under the False Claims Act because they have a natural tendency to influence, or be capable of influencing, the government's payment.

96. Had the government known that Escambia made claims for emergency services when only nonemergency services were provided, it would not have paid at the emergency rate.

*1. Escambia claimed "emergency" for 98% of its Medicare reimbursements.*

97. CMS reported Escambia claimed "emergency" for 98% of its reimbursements under Medicare part B in the years 2014 through 2020. Exhibit 1.

98. As the county's medical director, Dr. Edler's responsibilities involved medical decisions. She had few interactions with claims, and these involved claims on private insurance companies that required verification. Dr. Edler did not track emergency versus nonemergency calls as part of her job. Nor was she responsible for making emergency vs nonemergency billing decisions (except the occasional private insurance verifications). However, she has a clear recollection that far fewer than 98% of the calls were emergency.

99. Dr. Edler estimates that emergency calls represented just over half of the ambulance trips undertaken by Escambia.

## 2. 98% emergency is *not possible* because of scheduled nonemergency transports.

100. Escambia's claimed 98% emergency transportation under Part B is not possible because Escambia is not solely dedicated as a 911/Public Emergency agency. In addition to emergency transports, it performs many of the more lucrative scheduled interfacility/nonemergency transports.

101. Scheduled (therefore nonemergency) transfers are more lucrative than nonscheduled emergency transportation because scheduled transportation can be preapproved for payment.

102. Nonemergency transfers represent more than 2% of annual ambulance rides in Escambia.

103. Notwithstanding that Escambia suffered continuing vehicle and staffing shortages, it prioritized these more lucrative nonemergency prescheduled transfers over actual emergency responses.

104. As a result, Escambia's actual or real emergency response time suffered.

105. Commissioner Bergosh explained that Escambia, unlike many other counties, does not contract out ambulance services because they provide high-margin revenue. *See* below at ¶ 137.

106. Medicare covers medically necessary nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis under only limited circumstances (but does not pay at emergency rates). 42 C.F.R. § 410.40(e)(3).

### 3. Contemporaneous reports controvert its 98% claimed emergency rates

107. To qualify for billing at the emergency rate, an ambulance service is required to respond to the call for help *as quickly as possible*. 42 C.F.R. § 414.605.

108. To facilitate emergency responses "as quickly as possible," Florida exempts ambulances from other vehicles' speed limits so long as the emergency ambulances operate with lights and sirens. Florida Statute § 316.072(5)(a) (limited exempting from traffic laws for emergencies), § 316.126(3) and § 316.271(6) (requiring lights and sirens).

109. Escambia's on-the-scene EMTs and paramedics contemporaneously report and record whether they use lights and sirens.

110. Escambia's internal data show contemporaneously recorded reports of lights and sirens at a rate far below 98%.

111. Escambia data analyst Lindsay Ritter sent Dr. Edler an email with the subject line: "PCR's with trip tickets" with an attached spreadsheet. In addition to other information, the spreadsheet identified the "Disposition" of ambulance calls

from November 23, 2017 through October 31, 2019 for 18 medics/EMTs who taught AHA classes.

112. The spreadsheet records 14,353 patient transports.[8]

113. The "disposition" reports whether light/siren were used or not on each of these 14,353 calls.

| | | |
|---|---|---|
| Lights/Siren | 1,671 | 12% |
| No Lights/Siren | 12,615 | 88% |
| No Lights/Siren, Upgraded | 31 | 0% |
| | 14,353 | 100% |

114. Because 42 C.F.R. § 414.605 requires responding "as quickly as possible" to emergencies, and Florida statutes require ambulances responding as quickly as possible to use their lights and sirens, data reporting a high percentage of no lights and no siren use indicate the trip was not in fact responded to as quickly as possible and was not truly an emergency.[9]

---

[8] Many calls do not result in patient transports. Instead, their disposition includes: Canceled Prior to Arrival, 1,391; Canceled on Scene, No Patient, 668; Patient Refused Evaluation/Care without Transport, 536; and others.

[9] *See generally*, Billing and Coding: Emergency and Non-Emergency Ground Ambulance Services ("Compliance with ... Emergency and Non-Emergency Ground Ambulance Services may be monitored and addressed *through post payment data analysis* ...." Article A57674 https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57674&ver=5 *Whitcomb v. Burwell, Docket* No. 13-CV-990, 2015 U.S. Dist. LEXIS 119875, at *5 (E.D. Wis. Sep. 9, 2015).

115. Because Escambia's contemporaneous reports recorded 88% of these 14,353 calls did *not* use lights and sirens, and therefore did not respond "as quickly as possible," a large percentage of Escambia's emergency claims were actually for nonemergency services.

116. Escambia's dispatch department did not assign paramedics or EMTs, individually or by class of certification, based on whether a call was emergency or nonemergency.



117. Escambia billed the government as if 98% of its ambulance responses were emergencies when, according to its own contemporaneous documents, only 12% actually were. Escambia's No Lights/Siren documents (Exhibit 1 at 2).

118. To the extent Escambia's 14,353 records are representative, 86% (98%– 12%) of Escambia's claims were false claims and not reimbursable.

### 4. National and adjacent county claims are approximately 60% emergency

119. In contrast to Escambia's 98% emergency *claim* rate, the rest of the nation's Medicare part B claims average 40% non-emergency, and 60% emergency. Exhibit 1 (showing Part B claims from 2014 to 2020).

120. Similarly, ambulance service claims in Escambia's neighboring counties Santa Rosa, FL, and Baldwin and Escambia Ala, approximate national norms, showing slightly *fewer* non-emergency (39%) and more emergency (61%) Medicare Part B claims. Exhibit 1 (averaging ambulance service providers from 2014 to 2020).



121. Assuming for purposes of illustration that the nationwide average 60% emergency is correct, rather than Escambia's claimed 98%, then Escambia up-coded 34,904 of its 90,371 Medicare Part B claims during those years. Assuming an average up-code of $114, this totals an additional $3,978,510. Exhibit 1 at 3.

122. The preceding allegations and calculations focus only on Medicare Part B emergency claims. However, on information and belief, Escambia submitted

similar false claims to other government healthcare programs at the same rates as it submitted them to Medicare Part B. These other programs included Medicare Part C, Medicaid, Tricare, military and federal employees' family coverages. Because many Medicaid beneficiaries, and federal employees, retirees, and their families reside in and visit Escambia, the estimated $3,978,510 for 34,904 Part B false claims understates the total dollar amount and number of Escambia's false claims.

123. Regardless of the datapoint used, national averages, adjacent county averages, or Escambia's own contemporaneous documents, it is clear that an enormous number of Escambia's claims for emergency ambulance services are false and up-coded claims for non-emergency services.

**B. Escambia claimed *advanced* life support but provided basic life support**

124. Medicare requires providers to characterize ambulance services as providing either advanced or basic life support.

125. To facilitate the different reimbursement rates for these different categories of services, Medicare requires use of the below billing codes.

Advanced Life Support
A0426   Adv life support, non-emerg transport, level 1
A0427   Adv life support, emerg transport, level 1
A0433   Advanced life support, level 2

Basic life support
A0428   Basic life support, non-emerg transport
A0429   Basic life support, emerg transport

32

126. As with the emergency vs non-emergency up-code, billing for advanced life support generates higher reimbursements than billing for basic life support. During the years 2014 to 2020, falsely claiming a basic life support service as an advanced life support encounter generated an additional $51 per claim. Exhibit 1 at 3.

127. Medicare part B reported that for the years 2014 through 2020 Escambia claimed Advanced Life Support for more than 71% of its transports, far more than its neighbors, and the rest of the nation's Part B ambulance services which claimed 54% and 40% respectively. Exhibit 1 at 2.



128. For Escambia's 90,371 Medicare Part B claims from 2014 to 2020, comparing Escambia's percent of Advanced Life Support claims with the nationwide rate shows a 31% up-code rate of more than 28,000 false claims and $1.4 million in unearned reimbursements. Exhibit 1, p. 3.[10]

---

[10] This estimate is understated because it does not include1,002 payments for Advanced life support, level 2, A0433, which averaged $473 per payment (2014 – 2020).

129. As with the emergency up-code analysis, the preceding allegations and calculations focus only on Medicare Part B emergency claims. Because many Medicaid beneficiaries, and federal employees, retirees, and their families reside in and visit Escambia, these estimated Part B false claims also understate the total dollar amount and number of Escambia's false claims

130. Similar to the up-coded emergency vs nonemergency claims described above, these up-coded "Advanced" claims are literal false claims. Escambia billed the government for services it did not provide. Alternatively, Escambia billed the government for medical services which were not necessary and reasonable and were therefore false claims.

131. If the government had known the true facts, that only basic services were provided, it would not have paid Escambia at the more lucrative advanced services rate.

132. If Escambia's claims were true – that it is called upon to provide Advanced Life Support at a rate more than 30% more often than the rest of the country – it would require far more paramedics to deal with the much higher volume of serious Advanced Life Support patients. This significantly greater demand for advanced services makes Escambia's falsifications of certifications and trainings all the more egregious.

## C. Escambia **knowingly** up-coded claims.

133. Under the FCA, knowledge is defined as: (1) having actual knowledge of the information; (2) acting in deliberate ignorance of the truth or falsity of the information; or (3) acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent is required. 31 U.S.C. § 3729(b)(1)(B).

134. Congress added reckless disregard to the FCA to capture "the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (U.S. 11th Cir. 2021) (internal cites omitted).

135. Escambia's management knew, acted in deliberate ignorance, or acted in reckless disregard of these up-codes. 31 U.S.C. § 3729(b)(1).

136. On information and belief, one reason for this is because Escambia identifies and treats its EMS ambulance services as an "enterprise fund." [11] An "enterprise fund" is something that the County has "financed and operated in the manner of a private business." [12].

---

[11] Annual budget, page 529. https://myescambia.com/docs/default-source/sharepoint-administration/budget/2020_budget_escambia-countyv5.pdf?sfvrsn=8bdc1b6c_4

[12] Annual budget, *id.* at page 525.

137.    Unlike counties that contract out ambulance services to private companies, Escambia manages its EMS service in-house. During an official televised meeting of the Board of County Commissioners, Commissioner Bergosh explained why the County provides ambulance services, rather than private contractors: "It's an enterprise fund for us,"[13] and repeated:

"It generates revenue for us,"
"It generates revenue for us,"

138.    Comm. Bergosh summarized: "Our guys should be doing it because it generates revenue. . . . It spins off additional revenue." *Id.*

139.    During the brief discussion that followed, no Commissioner disagreed with this explanation. Not one mentioned health and safety. *Id.*

140.    Comm. Bergosh is correct that the county's ambulance business *spins off additional revenue.* For example, in 2018 the county pocketed profits exceeding $3.5 million dollars when it transferred $3,596,251 from its Emergency Medical Services Enterprise Fund 408 to its General fund 001.[14]

---

[13] ECTV, *Oct. 15, 2020 BCC Regular Meeting*, MyEscambia, at 16:30–17:30 (Oct. 15, 2020), https://escambiacountyfl.new.swagit.com/videos/87252.

[14] Annual budget 2018 p. 6 https://myescambia.com/docs/default-source/sharepoint-administration/budget/proposed-17-18-budget-book.pdf?sfvrsn=32d8296d_4

141.    Escambia's knowledge may be imputed from its employees' acts because "the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment." *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) (finding sufficient allegations of wrongdoing where the complaint set forth facts showing check-out cashiers knowingly accepted food stamps for non-food items). *See also United States v. Hill*, 676 F. Supp. 1158, 1178 (N.D. Fla. 1987) (same).

142.    Each of the Escambia employees responsible for coding, billing, and/or summitting the false claims identified above were acting within the scope of their employment and for the benefit of Escambia.

143.    Unscrupulous providers too often get away with this type of low dollar, expensive-to-discover-and-prove false claims. This is because Medicare initially pays almost all claims. Only later, if it determines a claim should not have been paid, does it seek reimbursement. 42 C.F.R. § 413.64 (f) (describing retroactive adjustments). This is known as "pay and chase." *United States v. Advantage Medical Transport Inc.*, 698 F. App'x 680, 682 n.2 (3d Cir. 2017).

## V. Escambia's Retaliation and FMLA violations.

### A. Escambia's retaliation against Dr. Edler violated the False Claims Act.

144. Dr. Edler opposed Escambia's illegal practices. She voiced her views to her superiors and others on multiple occasions. As a result of her identification and bringing to light the civil and criminal violations described above, Relator has experienced retaliation, intimidation, and harassment.

145. Defendant knew or should have known that Relator engaged in the protected activity.

146. Relator's reporting of the illegal conduct was both lawful and a protected activity under 31 U.S.C. § 3730(h).

147. As a direct and immediate consequence of Defendant's actions and failures to act, Dr. Edler has been harmed and is entitled to obtain relief in her own right under 31 U.S.C. § 3730(h).

### B. Escambia violated the Family Medical Leave Act.

148. The Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, (FMLA) and the implementing regulations, 29 C.F.R. Part 825, require that certain employers permit their employees to take periods of leave while protecting the employees' job and benefits status.

> On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such

reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.
29 C.F.R. § 825.214.

149. The regulations define an "equivalent position" as:

An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.
29 C.F.R. § 825.215(a).

150. Escambia is an employer under the FMLA that is required to offer its employees protected FMLA leave.

151. Dr. Edler was an employee of Escambia entitled to FMLA protection.

152. Dr. Edler complied with the FMLA.

153. She requested and was approved to take a period of FMLA leave.

154. Her approved FMLA leave began on or about June 25, 2021, and was scheduled to end on or about Friday, September 17, 2021.

155. This period of leave was necessitated by the crush of retaliation she had been experiencing for her role in reporting and attempting to stop the frauds which form the basis of this *qui tam* action.

156. Dr. Edler complied with Escambia's polices and procedures by contacting her supervisor one week before her period of FMLA leave was set to end to coordinate her return to work which was scheduled to occur on or about Monday September 20, 2021.

157. In response, Dr. Edler was directed not to resume her job duties but instead to report to Assistant County Administrator Bowers.

158. When Dr. Edler met with Ms. Bowers, she was presented a letter informing her that she was being terminated and that she was "immediately relieved of [her] duties as the EMS Medical Director."

159. In addition, Dr. Edler was instructed to cease performing her job duties as Medical Director and to instead spend the following 90 days performing the different and new job duties associated with serving as the in-house physician for County jail inmates or detainees.

160. Performing routine on-site medical care for persons at the County jail was never a part of Dr. Edler's job.

161. In fact, she is not qualified by education, training, or experience to serve in this capacity.

162. Dr. Edler is an accomplished and Board-Certified Emergency Medicine Physician with substantial EMS experience.

163. She holds no Board Certifications, specific education, training, or experience related to Family Medicine, Internal Medicine, or Primary Care generally.

164. It would be medically and professionally inappropriate for Dr. Edler to treat jail patients in a non-emergency capacity.

165. Her pre-leave role of providing a few hours per week of Medical Direction at the jail is in no way equivalent to providing direct in-patient care to persons at the jail.

166. The new job, providing routine on-site medical care at the jail, was not an equivalent position.

167. Through counsel, Dr. Edler informed Escambia that she would not perform this new job of in-house physician at the jail.

168. As a result, Escambia issued a letter dated September 29, 2021, falsely stating that Dr. Edler had "abandoned" her job and would no longer be paid unused and accrued leave. Doc. 38-1.[15]

169. The termination letter also recited the following pretextual explanation for Dr. Edler's termination:

> Due to the restructure of the Public Safety Department, your position of EMS Medical Director will be eliminated December 19, 2021...
> [T]his letter serves as the ninety-day written notice of the abolishment of your position with Escambia County.

170. This explanation was false and pretextual.

171. The position of EMS Medical Director was not abolished.

---

[15] https://ecf.flnd.uscourts.gov/doc1/04918371670

172. State and local laws and regulations require that Escambia contract with and/or employ an EMS Medical Director. See e.g., Fla. Stat. 401.26516 and Fla. Admin. Code 64J-1.004

173. In fact, during her leave, Escambia executed a contract with other physicians under which those other physicians were engaged to perform the same services and tasks Dr. Edler had been performing – the same services and tasks Escambia is required by law to contract with a Medical Director to provide.

## VI. Count I: Certification-Related False Claims Act Claims

### A. Submission of False Claims, 31 U.S.C. § 3729(a)(1)(A).

174. Relator incorporates by reference all the Part III Certification-Related allegations of this Complaint, as if fully set forth herein.

175. Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, acting through the Medicare and Medicaid programs.

176. As of the date of filing, any person found to have violated the FCA is liable for a civil penalty of not less than $12,537 and not more than $25,076 for each such violation, plus three times the damage sustained by the Government.

---

[16] "Each basic life support transportation service or advanced life support service must employ or contract with a medical director." Fla. Stat. 401.265.

**B. Use of false records or statements, 31 U.S.C. § 3729(a)(1)(B).**

177. Relator incorporates by reference all the Part III Certification-Related allegations, as if fully set forth herein.

178. Defendant knowingly made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the United States for reimbursement.

179. As of the date of filing, any person found to have violated the FCA is liable for a civil penalty of not less than $12,537 and not more than $25,076 for each such violation, plus three times the damage sustained by the Government.

**C. Reverse False Claim, 31 U.S.C. § 3729(a)(1)(G).**

180. Relator incorporates by reference all paragraphs of this Complaint, other than her retaliation and FMLA allegations, as if fully set forth herein.

181. Escambia made, used, or caused, to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, or both.

182. As of the date of filing, any person found to have violated the FCA is liable for a civil penalty of not less than $12,537 and not more than $25,076 for each such violation, plus three times the damage sustained by the Government.

### D. Unlawful retaliation against Dr. Edler, 31 U.S.C. § 3730(h).

183. Relator incorporates by reference all paragraphs of this complaint as if fully set forth herein.

184. Relator's reporting of unlawful conduct resulted in retaliation for protected acts taken by Relator to report violations of the False Claims Act and in retaliation for other lawful acts taken by Relator in furtherance of an action under the False Claims Act and/or the reporting of unlawful conduct.

185. County and EMS administration who took part in this retaliation include:

- Bergosh, Jeffrey, Commissioner,
- Bonoyer, James, Captain in Charge of Training and Training Center Coordinator (later arrested).
- Coughlin, Matt, Interim County Administrator, Escambia County,
- Dosh, John, Public Safety Director, Escambia County,
- Kenney , Katherine , EMS Section Chief and paramedic Supervisor (later arrested).
- Kleinert, Eric, Human Resources Director of Escambia County,
- Lovoy, Amy, Interim County Administrator,
- Peppler, Charles V., Deputy County Attorney,
- Rogers, Alison, County Attorney,
- Salter, Leon, Deputy Chief of Escambia Emergency Medical Services, (later arrested),
- Spainhower, Edward, Human Resources Associate,
- Weaver, Mike, Public Safety Director of Escambia County, and

- White, Steve, Chief of the Emergency Medical Services (later arrested).

186.   Defendant's retaliatory acts have proximately caused Relator to suffer and to continue to suffer substantial damage, including special damages, in an amount to be proven at trial.

187.   As a direct and immediate consequence of the County's actions and failures to act, Dr. Edler has been harmed and is entitled to obtain relief in her own right under 31 U.S.C. § 3730(h).

## VII.      Count II: False Claims Act Up-code Claims

### A. Submission of false claims, 31 U.S.C. § 3729(a)(1)(A).

188.   Relator incorporates by reference the Part IV up-code allegations as if fully set forth herein.

189.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

190.   Defendant knowingly and willfully violated the False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

191.   Specifically, for at least the last ten years, Defendant presented, or caused to be presented, medical bills to Government Healthcare Programs including Medicare and Medicaid seeking payment for services that were not reasonably

medically necessary, were rendered incompetently, rendered incompletely, or not rendered at all.

192. Defendant knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that it has for at least several years made, presented, or submitted, or caused to be made, false or fraudulent claims for payment to Government Healthcare Programs.

193. Each of the claims submitted or caused to be submitted by Defendant is a separate false and fraudulent claim.

194. Defendant presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

195. The United States was unaware of the foregoing circumstances and conduct of Defendant and, in reliance on said false and fraudulent claims, authorized payments to be made to Defendant, made such payments, and has been damaged.

196. Because of these false or fraudulent claims submitted or caused to be submitted by Defendant, the United States has been damaged in an amount to be determined at trial.

**B. Use of false records or statements, 31 U.S.C. § 3729(a)(1)(B).**

197.  Relator incorporates by reference the Part IV up-code allegations as if fully set forth herein.

198.  The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.

199.  Defendant knowingly and willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

200.  Specifically, for purposes of obtaining or aiding to obtain payment or approval of reimbursement claims made to Government Healthcare Programs, for at least the last ten years, Defendant made or presented, or caused to be made or presented, to the United States false or fraudulent records, knowing these records to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

201.  Each medical record, bill, and invoice submitted to the Government in support of Defendant's above-described false claims is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

202.  The United States was unaware of the foregoing circumstances and conduct of Defendant and, in reliance on said false and fraudulent records,

authorized payments to be made to Defendant, made such payments, and has been damaged.

203.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendant, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

**C. Concealing Obligation to refund funds, 31 U.S.C. § 3729(a)(1)(G).**

204.    Relator incorporates by reference the Part IV up-code allegations as if fully set forth herein.

205.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

206.    Upon receipt of improperly inflated reimbursements, Defendant had an obligation to repay and refund to the Government the amount of the overpayment.

207.    Defendant knowingly and willfully violated the False Claims Act by failing to so repay or refund overpayments it received.

208.    Each improperly inflated reimbursement received by Defendant generates a separate obligation to repay or refund those ill-gotten monies and Defendant's failure to do so is a separate violation of 31 U.S.C. § 3729(a)(1)(G).

209. The United States was unaware of the foregoing circumstances and conduct of Defendant.

210. Had the Government been aware of Defendant's knowing false certifications and knowing failure to return overpayments it would have taken steps to recover them.

211. The United States has been damaged as a result in an amount to be determined at trial.

## VIII.    Count III: Unlawful Interference with Family Medical Leave Act Rights

212. Relator incorporates by reference all paragraphs under the subheading "Escambia Violated The Family Medical Leave Act," as if fully set forth herein.

213. Under 29 U.S.C. § 2601 *et seq.*, covered employers are required to provide employees job-protected unpaid leave for qualified family and medical reasons.

214. Defendant is a covered employer under the FMLA.

215. During her employment, Dr. Edler qualified for FMLA leave.

216. As described in more detail above, Defendant interfered in Dr. Edler's exercise of her rights under the FMLA including, for example, by terminating her employment at the conclusion of her period of leave, directing that she work a new

and not equivalent position upon her return, and then withholding certain compensation benefits.

217.    As a direct and proximate result of Defendant's conduct, Dr. Edler suffered and will continue to suffer damages.

218.    As a direct and proximate result of Defendant's conduct, Dr. Edler is entitled to all damages provided for by 29 U.S.C. § 2617 including liquidated damages, cost and reasonable attorney's fees.

## IX.      Count IV: Retaliation in Violation of the Family Medical Leave Act

219.    Relator incorporates by reference all paragraphs under the subheading "Escambia Violated The Family Medical Leave Act" and under Count II as if fully set forth herein.

220.    During her employment, Dr. Edler utilized FMLA leave.

221.    After Dr. Edler utilized, or attempted to utilize, her qualified FMLA leave, Defendant retaliated against her.

222.    Defendant retaliated against her by terminating her position and employment, directing that she instead undertake a new, different, and not equivalent position for a period of 90 days, characterizing her termination as an "abandonment", and withholding certain compensation and benefits.

223.    Defendant's retaliation against Dr. Edler was willful.

224. As a direct and proximate result of Defendant's conduct, Dr. Edler suffered and will continue to suffer damages.

225. As a direct and proximate result of Defendant's conduct, Dr. Edler is entitled to all damages provided for by 29 U.S.C. § 2617 including liquidated damages, cost and reasonable attorney's fees.

## X. Prayer For Relief

WHEREFORE, Relator requests that judgment be entered against Defendant, ordering:

A.  Defendant pay an amount equal to all damages due to the Government, including treble damages, under the FCA;

B.  Defendant pay all civil penalties due to the Government for each of Defendant's violations of the FCA;

C.  Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d);

D.  Relator be awarded all costs of this action, including attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d) and any other applicable law or regulation;

E.  Defendant pay Relator all damages on her FCA retaliation, FMLA interference and FMLA retaliation claims including double back pay; interest on back pay; an award of front pay; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, benefits and seniority rights; and wages, benefits and other remuneration;

F.  An award of pre- and post-judgment interest; and

G.  The United States and Relator be awarded such other, further, or different relief as the Court deems just and proper.

Plaintiff requests trial by jury.

Respectfully submitted

*/s/ Jonathan Kroner*
FBN 328677
Jonathan Kroner Law Office
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
305.310.6046
jk@FloridaFalseClaim.com

Darth M. Newman
Law Offices of Darth M. Newman
LLC
1140 Thorn Run Rd., #601
Coraopolis, PA 15108
412.436.3443
darth@dnewmanlaw.com
(admitted pro hac vice)

Attorneys for *Qui Tam* Plaintiff Relator Rayme M. Edler, M.D.

**Certificate of Service on the U.S., and NOT on Defendant**
Pursuant to Local Rules 5.4(A)(2) and 5.5 governing sealed documents, I filed hard copy paper with the Clerk of the Court.
I served the United States. I did not serve Defendant or its counsel of record.

*/s/ Jonathan Kroner*

**Escambia and Neighbors Medicare Claims, Part B 2014 -2020**

| HCPCS Code / desc | | Escambia | Santa Rosa, FL; Baldwin and Escambia Ala | Fed Part B |
|---|---|---|---|---|
| A0426 | ALS NonE | 1,156 | 6,154 | 648,307 |
| A0427 | ALS Emer | 63,189 | 98,189 | 8,935,533 |
| A0428 | BLS NonE | 342 | 69,238 | 9,046,049 |
| A0429 | BLS Emer | 25,684 | 20,334 | 5,437,272 |
| | | 90,371 | 193,915 | 24,067,161 |



**Emergency / Non Emergency Comparison - Claims**

| HCPCS Code | | Escambia Claims | Santa Rosa, FL; Baldwin and Escambia Ala | Nationwide Part B | Escambia lights /sirens |
|---|---|---|---|---|---|
| A0427 | ALS Emer | 63,189 | 98,189 | 8,935,533 | |
| A0429 | BLS Emer | 25,684 | 20,334 | 5,437,272 | |
| | | 88,873 | 118,523 | 14,372,805 | 1,671 |
| | | | | | |
| A0426 | ALS NonE | 1,156 | 6,154 | 648,307 | |
| A0428 | BLS NonE | 342 | 69,238 | 9,046,049 | |
| | | 1,498 | 75,392 | 9,694,356 | 12,682 |

Escambia's transport records (Ritter Exhibit) show 14,353 transports
12% (1,671) with lights/sirens and 88% (12,682) without lights/sirens.

| | | Escambia Claims | Santa Rosa, FL; Baldwin and Escambia Ala | Nationwide Part B | Escambia no lights /sirens |
|---|---|---|---|---|---|
| Emerg | Emerg | 98% | 61% | 60% | 12% |
| Non Emerg | Non Emerg | 2% | 39% | 40% | 88% |
| | | 100% | 100% | 100% | 100% |
| | | | | | |
| Difference from Escambia Emerg Claim %: | | | 37% | 39% | 87% |

**Advanced / Basic Analyis**

| HCPCS Code | | Escambia Claims | Santa Rosa, FL, and Baldwin and Escambia Ala | Nationwide Part B |
|---|---|---|---|---|
| A0426 | ALS NonE | 1,156 | 6,154 | 648,307 |
| A0427 | ALS Emer | 63,189 | 98,189 | 8,935,533 |
| Advanced totals | | 64,345 | 104,343 | 9,583,840 |
| | | | | |
| A0428 | BLS NonE | 342 | 69,238 | 9,046,049 |
| A0429 | BLS Emer | 25,684 | 20,334 | 5,437,272 |
| Basic totals | | 26,026 | 89,572 | 14,483,321 |
| | | | | |
| Totals | | 90,371 | 193,915 | 24,067,161 |

**Advanced / Basic Comparison**

| | Escambia Claims | Santa Rosa, FL, and Baldwin and Escambia Ala | Nationwide Part B |
|---|---|---|---|
| Advanced | 71% | 54% | 40% |
| Basic | 29% | 46% | 60% |
| | 100% | 100% | 100% |
| | | | |
| Difference from Escambia Adv Claim %: | | 17% | 31% |



## Damages Analysis

**Part B claims 2014 - 2020**

|  |  | Claims |  | Amt paid |  | $/claim |
|---|---|---|---|---|---|---|
| A0426 | ALS NonE | 1,156 | $ | 239,198 | $ | 207 |
| A0427 | ALS Emer | 63,189 | $ | 20,731,218 | $ | 328 |
| A0428 | BLS NonE | 342 | $ | 59,104 | $ | 173 |
| A0429 | BLS Emer | 25,684 | $ | 7,096,557 | $ | 276 |
|  |  | 90,371 | $ | 28,126,077 | $ | 311 |

**Emergency Damages Estimate Medicare Part B**

|  | HCPCS Code | Claims |  |  |  |  |
|---|---|---|---|---|---|---|
| A0427 | ALS Emer | 63,189 | $ | 20,731,218 |  |  |
| A0429 | BLS Emer | 25,684 |  | 7,096,557 |  |  |
|  |  | 88,873 |  | 27,827,775 | $ | 313 |
|  |  |  |  |  |  |  |
| A0426 | ALS NonE | 1,156 | $ | 239,198 |  |  |
| A0428 | BLS NonE | 342 |  | 59,104 |  |  |
|  |  | 1,498 |  | 298,302 | $ | 199 |
|  |  |  |  |  | $ | 114 |

**Average emergency upcode $ benefit**

| Assumed upcode % |  | 39% |
|---|---|---|
| Total claims |  | 90,371 |
| Upcodes |  | 34,904 |
| Amount | $ | 114 |
| Damages | $ | 3,978,510 |

**Advanced / Basic Damages Medicare Part B**

|  | HCPCS Code | Claims |  | Part B |  | Avg pd / claim |
|---|---|---|---|---|---|---|
| A0426 | ALS NonE | 1,156 | $ | 239,198 |  |  |
| A0427 | ALS Emer | 63,189 | $ | 20,731,218 |  |  |
|  |  | 64,345 |  | 20,970,416 | $ | 326 |
|  |  |  |  |  |  |  |
| A0428 | BLS NonE | 342 | $ | 59,104 |  |  |
| A0429 | BLS Emer | 25,684 | $ | 7,096,557 |  |  |
|  |  | 26,026 |  | 7,155,661 | $ | 275 |
| Average Advanced Upcode $ benefit |  |  |  |  | $ | 51 |

Escambia Claims

| Assumed upcode % |  | 31% (Escambia % - Nationwide %) |
|---|---|---|
| Total claims |  | 90,371 |
| Upcodes |  | 28,358 |
| Amount | $ | 51 |
| Damages | $ | 1,445,220 |